## CHARLESTON.

CITY OF WELCH *v.* REBECCA J. MITCHELL, *et als.*

Submitted November 6, 1923.    Decided January 15, 1924.

1.  MUNICIPAL CORPORATIONS—*City May Adopt Reasonable Restric-tions for Building Along Stream to Protect Against Floods.*

    A city, authorized by its charter to make proper regulations for guarding against danger ·or damage from fire, water or · other element and to regulate the construction of buildings, may, as a proper exercise of its police power, adopt reasonable restrictions for buildings upon lands along a stream flowing through the city so as to avoid danger from floods.   (p. 382).

2.  EMINENT DOMAIN—MUNICIPAL CORPORATIONS—*City May Pro-hibit by Ordinance Construction of Buildings Beyond Fixed Lines on Land Bordering Stream; Owner Not Entitled to Compensation for Land Bordering Stream Which He is For-bidden to Use by Reasonable Ordinance.*

    To that end it may adopt an ordinance fixing building lines on each side of the stream, beyond which it may prevent the owners of lands bordering thereon from constructing their buildings, even though their title extends to the middle of the stream.  And if the restriction be reasonable, a riparian owner is not entitled to compensation for that portion of his land which he is thus forbidden to use.   (p. 383).

3.  MUNICIPAL CORPORATIONS—*City Should Not Change Uniformly Fixed Building Lines on Each Side of Stream, Without Notice and Hearing.*

    But where the title of the respective riparian owners extends to the middle of the stream, and the city has by ordinance

fairly and impartially fixed building lines on both sides of the stream at an equal distance from the middle or thread of the stream, so as to keep the stream unobstructed by buildings and at a uniform width through the restricted area, it should not thereafter, without notice and an opportunity to be heard, change the building lines so as to deprive owners of the use of additional portions of their lands; and then, though exercising its police power, it should, unless strong necessity requires otherwise, treat the riparian owners impartially. (p. 384).

4.  EMINENT DOMAIN—*City Cannot Permit Riparian Owners on One Side of Stream to Encroach Beyond Fixed Building Line to Disadvantage of Those on Opposite Side, Without Compensation.*

Where the city has adopted an ordinance fixing the middle of the stream as a base line and building lines on either side at a distance of thirty feet therefrom so as to keep the stream unobstructed at a width of sixty feet, and this width is found to be sufficient, it cannot thereafter, by permitting the riparian owners on one side of the stream to encroach upon and obstruct the stream on that side, under the guise of its police power, adopt an ordinance relocating the building line on the other side so as to maintain the width of sixty feet and by injunction prevent the owner of land on that other side from building upon the line as originally established. To deprive him of the use of the additional land it must make compensation to him. (p. 386).

Appeal from Circuit Court, McDowell County.

Suit by the City of Welch against Rebecca J. Mitchell and others. From a decree dissolving an injunction, plaintiff appeals.

*Affirmed and remanded.*

*Crockett & Sanders,* for appellant.
*Howard & Howard,* for appellees.

MEREDITH, PRESIDENT:

The plaintiff, City of Welch, is located at the junction of Elkhorn Creek and Tug River, and extends for a considerable distance along both sides of both streams. Elkhorn Creek flows through a portion of the city in a southwesterly direction. The Elkhorn valley is narrow and building ground there is at a premium. The defendants, who own a lot abut-

ting on the south side of Elkhorn, in September, 1923, began the construction of a concrete foundation or wall thereon, under a permit granted by the city authorities on May 3, 1921. The wall is located along the creek and on a building line established by the city September 2, 1920. After defendants had expended about $3,500 upon their work, the city obtained an injunction from the McDowell County Circuit Court enjoining them from proceeding further with the construction and requiring them to remove the portion of the wall then constructed, on the ground that it was a dangerous obstruction in the stream. The allegations of the bill were supported by numerous affidavits. Immediately after the injunction was awarded, defendants filed their answer, supported by a number of affidavits, and on the same day the injunction was dissolved. From that order the city obtained an appeal.

Elkhorn Creek is upward of twenty miles long and with its tributaries drains a large area. It is alleged by plaintiff that to avoid serious danger from floods it is necessary to keep the creek, where it flows through the city, at least sixty feet wide; accordingly, on September 2, 1920, the city engineer, L. A. Osborn, at the direction of the city council, established building lines along the creek, one on the south side and one on the north side, through the area affected. These lines were established sixty feet apart, by city ordinance. A copy of the minutes showing the passage of the ordinance is in the record. Thereafter, on May 3, 1921, defendants applied to the city council for, and obtained, a permit to erect a stone or cement wall on their lot, "to be located on the building line as run by L. A. Osborne, City Engineer, and adopted by the council". At the same meeting Simon Solins was "granted permit to erect a brick building on his lot adjoining the Swope & Hill Building." This lot is located on the north side of the stream and is in part directly opposite the Mitchell lot. About this time the defendants, the Mitchells, obtained an injunction restraining Solins from the further construction of his building because the wall extended beyond the building line. This injunction proceeding was finally compromised by agreement, June 21, 1921, but when Solins' permit was granted no such agreement appears to have been

affected; just when he started his building is not disclosed, but evidently the matter of his building over his line was discussed when his permit was granted, because James P. Flanagan, who was on the Mitchell injunction bond, and who owned a lot adjoining the Mitchell lot, as a member of the city council objected and voted against the Solins permit. The compromise agreement between Solins and the Mitchells was not executed until June 21, 1921, nearly seven weeks after the Solins permit was granted. It is contended by the city that this permit did not authorize Solins to build beyond the line and that the officials did not know he was doing so until after the injunction was awarded to Mitchell; that the construction of the Solins building was then stopped until Solins should come to some agreement with Mitchell whereby the line on the south side of the creek should be pushed back on the Mitchell property six feet and four inches, the same distance the Solins wall projected over on the north side, thus leaving the stream 60 feet wide, and that upon being assured that this agreement had been made, Solins was allowed to go ahead and finish his four story brick building.

The agreement recites: (1) that the Mitchells own the lot on the south side of Elkhorn; (2) that Solins owns a lot on the north side; (3) that these two lots lie in part opposite each other; (4) that there is some other land lying on Elkhorn Creek east of the Solins lot and west of the concrete bridge over the creek; (5) that Solins has erected a wall on his lot and is now erecting a four story brick building thereon; (6) that the Mitchells have pending a suit to enjoin Solins from finishing the building and to require him to remove a part of his wall; (7) that a temporary injunction has been awarded and bond has been given; (8) that it is the desire of the Mitchells and Solins "to forever agree and determine upon where houses can be built between Elkhorn Creek and Elkhorn Street (a street parallelling the creek and north of the Solins lot), not only upon the lot which is now owned by the said Solins, but upon the other property lying east of him and west of the before mentioned concrete bridge"; (9) that it is the desire of the Mitchells to "construct a bridge suitable for pedestrains and vehicles across ·Elkhorn

Creek from their property to Elkhorn Street''; and ''In consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto do agree as follows, and do grant and convey to each other whatever is necessary of their respective lots to the full enjoyment of the rights hereby conveyed each other.''

1.  Mitchells agreed to dismiss the injunction suit, at their own costs.

2.  Solins agreed to release them and James P. Flanagan from all liability upon the injunction bond.

3.  Mitchells agreed to release Solins, his heirs and assigns from ''all damage to them or their property which has accrued or may hereafter accrue by virtue of the erection of the wall and building now in course of erection or of any other wall or building that may be erected upon the property of the said Simon Solins, provided the wall thereof does not extend further into the stream than a straight line drawn from the southeastern corner of the wall as it now stands to a point on the western side of the concrete bridge now across Elkhorn Creek, which has been located by the city engineer of the city of Welch, and adopted by the council of said city as the southern point in that place as the building line of said street (stream) but nothing herein shall prevent the extension of the building over said wall and over the said creek.''

4.  Mitchells release all damage that may accrue to their lot by any one building on the property lying on Elkhorn Street and east of the Solins lot, but the building wall or walls shall not extend beyond the building line along the creek established as stated in the preceding paragraph, but this shall not prevent an extension over the creek above the wall for any building.

5.  Solins agrees that the Mitchells shall have the right to use for the construction and maintenance of their proposed bridge that part of the Solins lot twelve feet in length along the creek, the eastern line of which shall be four feet in width between the said building line and the northerly boundry line of the Solins lot; the bridge is to be begun in 18 months, Solins, his heirs and assigns to have the right to tie to

the bridge, if it will not affect its stability or usefulness, any building he may construct on his lot, with the right to make entrances, or show windows opening on or off the bridge.

6.   Unless the bridge is begun in 18 months and proceeded with to completion in a reasonable time, Mitchells' rights to use the 12 foot strip of land shall cease.

7.   No extensions of any building erected on land lying east of the Solins lot shall be made over the foundations at lower distance from the water of Elkhorn Creek than the top of the foundation wall of the Solins building.

It is shown that when this agreement was entered into Solins paid the Mitchells $750 as a part of the consideration.   It is observed that no where in the agreement is the building line on the south side of Elkhorn Creek referred to.   It is quite clear that Solins and the Mitchells, so far as they could, meant to establish a new building line along the north side, not only along the Solins lot, but also the land lying east of it up to the concrete bridge.   It does not appear who owned the land between the Solins lot and the bridge, but that is immaterial as it was not owned by Solins or the Mitchells.   But if they meant to establish a new building line on the south side, they certainly failed to do so by this agreement.   Besides, the Mitchells did not own all the lands which would be affected by relocating the line on the south side, and, so far as the record shows, had no authority to bind any other lands on the south side by any such agreement.

It is claimed by the city that until Solins and the Mitchells had compromised their matters, it refused to permit Solins to go on with his building, but that upon their agreement, it established the new building line on the north side of the creek as mentioned in the agreement and also a new building line on the south side sixty feet distant, which would shove the line back on the Mitchell property six feet and four inches from where they are building their wall.   The records of the city are silent as to the establishing of any new building line. It seeks to show by parol that an ordinance was passed relocating the building line on the south side of the creek, and that it was for this that Solins paid the Mitchells $750.00.

That the city under its charter as hereinafter shown has ample authority to establish reasonable building lines and re-

strictions along this stream can not be denied; this is conceded by defendants. Nor can we say upon the facts shown in this case that to require abutting owners to locate their buildings thirty feet back from the center of the stream, so as to keep the stream unobstructed at a width of sixty feet is unreasonable. No higher duty can devolve upon the city authorities than that of protecting the property, health and lives of the people; this is their paramount duty,—a duty which can not be evaded; nor can their right to do so be lost by neglect or be bartered away.

It seems to be conceded that the title of the respective riparian owners extends to the middle of the stream. The city, taking the thread of the stream as a base line, established the building lines on either side at a distance therefrom of thirty feet. Then Solins built a foundation wall on his property six feet and four inches beyond the line as located on his property. At this juncture the Mitchells obtained an injunction, restraining the completion of the building; of course, the basis of their proceeding was that it would do their property some special damage or injury not shared in by the general public. The record of that suit is not before us; but since the injunction was awarded, we can assume that it was issued on proper grounds. At that stage of their case, the city stepped in and forbade Solins to complete his building until he had made some adjustment with the Mitchells. He then came to an agreement with them whereby the question of special damages to their property was adjusted. But there was no agreement between Solins and the Mitchells establishing a new building line on the Mitchell lot. The written contract appears to be clear and unambiguous; there is no room for resort to parol evidence to aid in its interpretation; it must therefore be deemed to express the whole matter agreed upon.

The city seems to contend that because it acted upon the understanding that Solins and the Mitchells had agreed upon a relocation of the building line on the Mitchell lot and because of that understanding it permitted Solins to complete his building, the Mitchells are estopped from denying that such an agreement was made between them. This position can not be maintained; the estoppel is not well pleaded, nor is

it shown that the city was misled to its prejudice by any act of the Mitchells. The city took no step to prevent Solins from completing his building out in the stream, beyond the building line fixed by city ordinance; by its neglect it compelled the Mitchells, at their own expense, to go into court and by injunction proceedings to obtain protection to their property rights. Of course, the Mitchells were then looking after their own interests. What they then did resulted for the moment to the benefit of the city. The building was stopped and to that extent the ordinance was enforced. The city having neglected its own interests as well as the Mitchells', the Mitchells could hardly be called upon to look after the city's interests when they made the agreement with Solins. They did just what might have been expected,—looked after their own interests and left the city's interests to be taken care of by the city. They drove the best bargain with Solins they could,— obtained a right to build and maintain a bridge from their land across to and over his and received $750.00 as damages for the shifting of the north side building line. This agreement was not made for the benefit of the city. It not only was not a party to it, but we fail to see where its rights were recognized in the least. On the contrary, they seem to have been wholly disregarded. As Solins is not a party to this suit, it would be improper to express any opinion as to whether the city is bound by the agreement or its conduct in permitting Solins to proceed to the completion of his building, under the circumstances heretofore detailed.

As already stated, the city had authority to fix the two building lines as first established. It seems to have done this in a fair and impartial manner, though it would have been better had it given notice to the parties whose lands were affected thereby, and an opportunity to be heard. The lines once established, and the Mitchells having been given a building permit based thereon, it occurs to us that the building line on the Mitchell lot could not be changed without notice to the Mitchells. Under that permit and under the ordinance the Mitchells could build on their lot out to the line. By the ordinance the city found that there would be no dangerous obstruction of the stream so long as that ordinance was respected. Now merely because the line on the

north side has been encroached upon can the city, under its police power, by showing that to build upon the line on the south side as originally established will so narrow the channel as to render the stream dangerous at flood stage, prevent the Mitchells from a lawful use of their property? Certainly not without compensation. We fully recognize the difference between the exercise of the police power and the right of eminent domain. The city, in originally establishing the building lines, exercised its police power; it then deprived the owners of the lands along Elkhorn Creek of their right to build on their lands so as to obstruct the flow of the stream. This it had a right to do without making compensation; just in the same way as a city can prevent an owner in a restricted fire zone from building therein a dangerous wooden structure. Nor do we mean to say that the city is irrevocably bound by the original building lines as established. If seventy feet between the building lines were required now, instead of sixty, that width might be established; then, however, we think the city should act impartially, and, unless required otherwise, it should move the lines an equal distance on each side of the stream.

The city, under its charter, among other things, is authorized "to make proper regulations for guarding against danger and damage from fires, water or other element"; "to provide for and regulate the safe construction, inspection, and repairs of all public and private buildings, bridges, basements, culverts, sewers or other buildings or structures of any description; to take down and remove, or make safe and secure, any and all buildings, walls, structures or superstructures at the expense of the owner thereof, that are or may become dangerous, or to require the owners or their agents, to take down and remove them, or put them in a safe condition at their own expense . . . . and when the council determines that any real estate in or out of the city is necessary to be acquired by said city' . . . . for any public purpose or is necessary in the exercise of its powers herein granted, the power of eminent domain is hereby conferred upon said city and it shall have the right to institute condemnation proceedings against the owner thereof in the same manner, to the same extent, and upon the same conditions, as such

power is conferred upon public corporations by chapter forty-two of the Code of West Virginia."

Under its broad charter powers the city may condemn such land as it needs for public purposes or that is necessary to the exercise of the powers granted. It has appealed to a court of equity to prevent the defendants from lawfully using their own lands under a permit granted by the city; this appeal is based upon the plea that such use will prove dangerous to the public. It might have merit if the city had not by its own negligence permitted Solins to violate its own ordinance. If his building were on the original line, defendants' building would create no danger. It is the Solins building and not the Mitchell wall that obstructs the stream. We do not think the city should be permitted to deprive defendants of the use of their property for the benefit of those whose lands lie on the opposite side of the stream under the guise of its police power. To do so even for public use under the present circumstances it must make compensation. If it can not agree with the owners upon the price, it may condemn; but it must do equity.

As a speedy remedy is afforded at law, and as the record does not show any immediate, but only a possible, danger from floods, we do not think the injunction should be re-instated. The city permitted defendants to build the wall without objection. They should not be compelled to remove it without being paid for it, and to re-instate the injunction now would mean that the wall must be removed before compensation is paid or offered.

We will therefore affirm the decree dissolving the injunction; and as there was no dismissal of the bill, the cause will be remanded.

*Affirmed and remanded.*